UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

**Baker Hughes Oilfield Operation**     Civil Action No. 04-2295

versus     Judge Tucker L. Melançon

**Flash Gas & Oil Southwest, Inc.**     Magistrate Judge Mildred E. Methvin

MEMORANDUM RULING

Before the Court is a Motion for Partial Summary Judgment [Rec. Doc. 50] filed by plaintiff, counter-defendant Baker Hughes Oilfield Operation ("Baker Hughes"), and a Memorandum in Opposition [Rec. Doc. 53] thereto filed by defendant, counter-plaintiff Flash Gas & Oil Southwest Inc. ("Flash").

This case involves plaintiff's claims for payment in the amount of $196,764.98 and $163,199.46, respectively, together with accrued contractual interest, attorneys' fees and costs that plaintiff alleges defendant owes for goods, equipment, supplies, and services that plaintiff furnished for and in connection with the drilling and/or operation of certain wells located on a lease operated by defendant.  [*Complaint,* Rec. Doc. 1].[1]  Flash filed

---

[1] The original Complaint [Rec. Doc. 1] alleges that between March 12, 2004 and June 14, 2004, Baker Hughes d/b/a Baker Oil Tools furnished goods, equipment, supplies, and services totaling $196, 764.98 (*Complaint,* ¶9); additionally, the Complaint alleges that between April 6, 2004 and June 7, 2004 Baker Hughes d/b/a Baker Atlas furnished goods, equipment, supplies and services totaling $163, 199.46 (*Complaint,* ¶10).  Pursuant to Louisiana Revised Statute § 9:4861 *et seq* and 433 U.S.C. § 1333(2)(2)(A), Baker Hughes d/b/a Baker Oil Tools and Baker Atlas, respectively, were granted a privilege and lien for payment for their work and properly preserved and perfected oil well liens securing the debt by filing lien affidavits. (*Complaint,* ¶11).  On

an Answer to Baker Hughes' Complaint and a Counter-Claim on January 20, 2005, alleging that Baker Hughes rendered faulty services that damaged one of the wells, and so is liable to Flash for all costs to restore the well to the same condition it was in before Baker Hughes damaged it, as well as loss of production revenues. [*Answer & Counterclaim,* Rec. Doc. 12]. The instant Motion pertains to Flash's Counter-Claim. Baker Hughes, as counter-defendant, moved to dismiss the prayer for damages for loss of production on the grounds that certain express provisions of the contract in force between the parties does not allow for recovery of this type of damages.

## I. FACTUAL BACKGROUND

From the evidence of record, the pertinent facts are as follows. Baker Hughes is an oilfield service company, engaged in the business of furnishing labor, equipment, machinery, material, and various services in support of drilling, development, exploration, and/or operation of oil and gas wells. (*Complaint,* ¶¶ 1&7). Baker Oil Tools and Baker Atlas are each operating divisions of Baker Hughes. Defendant Flash is an oil and gas operator in the business of discovery, drilling for, and producing oil and gas. More pertinently, Flash is the operator of certain oil, gas and mineral leases and wells currently producing hydrocarbons located on two mineral leases in the Lake Arthur Field, Jefferson

---

November 9, 2004, Baker Hughes filed the instant suit claiming that it is entitled to recognition and enforcement of its liens and privileges under LSA-R.S. § 9:4861 *et seq* upon the property and interests of Flash in the Roche Lease, as set out hereinafter, for the allegedly unpaid portion of the furnished services, as well as interest, attorneys' fees and costs. (*Complaint*, Rec. Doc. 1).

Davis Parish, Louisiana. (*Complaint,* ¶¶ 2-3). At issue here is work performed and services rendered as to one of Flash's wells, Well No. 2 on the Roche Lease, located at Section 35, Township 10S. Range 04W. Meridian W. in Lake Arthur Field, Jefferson Davis Parish, Louisiana ( "Roche No. 2 well" or "the Roche Lease") (*Complaint,* ¶8).

In the Spring of 2004, Steve Haller ("Haller"), president and owner of Flash, contacted Don Credeur ("Credeur"), a salesman for Baker Oil Tools, on behalf of Flash to discuss hiring Baker Oil Tools to perform the well completion services on the Roche No. 2 well. (*Plaintiff's Motion*, p.3). Baker Hughes claims that, as is standard and routine in the industry, Credeur and Haller went over all of the well information Baker Hughes would need to prepare a proposed well schematic and pricing for the completion services. *Id.* Credeur allegedly sent an e-mail to Haller with the proposal for equipment and services to be provided, attaching to that e-mail a Microsoft Excel workbook that contained all of the information concerning Baker Hughes' proposal to do the work necessary to complete the well. *Id.* Because Baker Hughes and Flash did not have a Master Service Agreement in force, Baker Hughes claims that in conformance with standard custom and practice in the industry and its own standard course of dealing, the e-mail and its attachment also properly notified Flash that any work performed would be governed by Baker's standard Terms and Conditions. (*Id.*). The Terms and Conditions were allegedly part of the Excel workbook attachment, contained as one of fifteen tabs of the workbook and titled Terms and Conditions. Another tab of the Excel workbook allegedly e-mailed to Flask was a cover letter stipulating that if Baker Hughes was to

3

perform the quoted services, the work would be governed by Baker Hughes' standard Terms and Conditions, and additionally, by calling Baker Hughes out to do the work, Flash would be agreeing to be bound by those Terms and Conditions. (*Id.* at pp. 4-5; *Plaintiff's Statement of Material Facts*). Baker Hughes alleges that shortly after Credeur sent the e-mail to Haller, Haller called Baker Hughes to perform the work set forth in the Microsoft Excel workbook attachment and that at no time did Haller ever object to or disagree with any part of the Baker Hughes' offer. (*Id.*). Flash admits that on or about March 24, 2004, Flash called Baker Hughes out to perform the work represented in the Baker Hughes proposal. (*Defendant's Statement of Material Facts).* However, Flash, through its principal Steve Haller, denies that it or any representative of Flash ever received the e-mail or its attachment, or saw or accepted the Terms and Conditions. (*Id.*).

As for facts giving rise to defendant's counter-claim, part of Baker Hughes' duties was to design and conduct the completion of the Roche No. 2 well, which included running a series of permanent packers designed to isolate individual intervals of the well. Flash alleges that while setting the final packer in the completion operation, Baker Hughes erred in "calculating the depths for landing both seal assemblies." Flash explains that "In layman's terms, Baker set one of the packers in the wrong place." (*Defendant's Opposition,* p.2).

Because of Baker Hughes' alleged error, instead of being in a position to run completion tubing and put the well on line for production, Flash claims that it was forced to

conduct a risky and costly operation to extract the improperly-placed packer.[2] (*Id.*). The claimed end result was that the two perforated well intervals were subjected to hydrostatic pressures that were above the fracture pressure for the reservoir, and the increased hydrostatic pressures caused drilling mud to be lost in the formation, resulting in damage to the formation that negatively impacted the well flow rates. (*Id.*).

Flash further alleges that it discovered that the packers that Baker Hughes set in the well were not sealed correctly and that the final packer that Baker Hughes set was pulled up the well hole approximately twenty (20) feet. (*Id.*). Flash explains that the packers were supposed to be permanent and are not supposed to move. Flash claims that the movement of the final packer is further evidence of Baker Hughes' alleged negligence and/or incompetence in performing the work for which it was hired, all of which has caused Flash considerable damage. (*Id.*).

Flash filed a counter-claim against Baker Hughes seeking all damages allowable under Louisiana law caused by Baker Hughes' negligence and/or incompetence and/or failure to perform its work in a workmanlike manner. (*Id.*). Flash claims that it hired Baker Hughes to perform certain completion work on the well that, once Baker Hughes negligently performed, ruined any opportunity for Flash to conduct any meaningful operations at that well site. (*Id.* at p.3). Baker Hughes' alleged negligence caused Flash significant damages,

---

[2] Flash hired Dishman and Bennett Specialty Company, Inc. ("Dishman") to perform the remediation services at the well. Dishman failed to properly clean out the well bore, and, as a result, the well bore was blocked or obstructed. Flash has also filed a claim against Dishman for its failure to perform its work properly.

including the lost opportunity to extract potentially significant oil and gas reserves from the well. Flash prays for all costs to place the well in the same condition it was in before Baker Hughes allegedly set the packer in the wrong place and the drilling mud was lost in the formation. Flash also prays for all damages caused by Baker Hughe's error in damaging the well, including, but not limited to, lost production from the well. (*Id.*).

On October 10, 2006, Baker Hughes filed its Motion for Partial Summary Judgment [Rec. Doc. 50] seeking dismissal of Flash's counter-claim for recovery of the alleged loss of production revenues from the oil and gas well involved in this litigation. (*Plaintiff's Motion,* p.1). Baker Hughes asserts that which parties are responsible for the measurement error, which parties are responsible for the pumping of drilling mud into the formation, whether the well formation was actually damaged, and whether Flash in fact sustained any loss of production revenue at all are strongly disputed . Baker Hughes seeks summary judgment asserting that regardless of whether or not Flash sustained a loss of production revenues, and if so, by whose fault, Flash is contractually precluded by the express wording of the Terms and Conditions provision of the contract in force between Baker Hughes and Flash from recovering any such loss from Baker Hughes. (*Id.*).

Flash alleges that it never received or accepted Baker Hughes' Terms and Conditions and thus it was not made part of the contract between Flash and Baker Hughes. Flash alleges that Baker Hughes cannot prove that the e-mail with the Excel workbook attachment containing the Terms and Condition allegedly sent was actually sent to Haller or anyone at

6

Flash. In fact, Haller denies ever seeing the Terms and Conditions and denies that the alleged e-mail was received by Flash.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir.1994)(en banc). Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact. When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Id.* If the moving party fails to carry this burden, his motion must be denied. If he succeeds, however, the burden shifts to the non-moving party to show that there is a genuine issue for trial.[3] *Id.* at 322-23.

---

[3] Where the nonmoving party has the burden of proof at trial, the moving party does not have to produce evidence which would negate the existence of material facts. It meets its burden by simply pointing out the absence of evidence supporting the non-moving party's case. *Celotex Corp.,* 477 U.S. at 325. To oppose the summary judgment motion successfully, the non-moving party must then be able to establish elements essential to its case on which it will bear the burden of proof at trial. A complete failure of proof by the non-moving party of these essential elements renders all other facts immaterial. *Id.* at 322.

Once the burden shifts to the respondent, he must direct the attention of the court to evidence in the record and set forth specific facts sufficient to establish that there is a genuine issue of material fact requiring a trial. *Celotex Corp.,* 477 U.S. at 324; Fed.R.Civ.Pro. 56(e). The responding party may not rest on mere allegations or denials of the adverse party's pleadings as a means of establishing a genuine issue worthy of trial, but must demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact or law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144. 159 (1970); *Little,* 37 F.3d at 1075. There must be sufficient evidence favoring the non-moving party to support a verdict for that party. *Anderson,* 477 U.S. at 249; *Wood v. Houston Belt & Terminal Ry.,* 958 F.2d 95, 97 (5th Cir.1992). There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party. *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990).

If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment prayed for. Fed. R. Civ. P. 56©; *Celotex Corp.*, 477 U.S. at 322. Before it can find that there are no genuine issues of material fact, however, the court must be satisfied that no reasonable trier of fact could have found for the non-moving party. *Id.*

### III. LAW & ANALYSIS

Simply put, this Court is called upon to decide whether Flash accepted the allegedly proposed Terms and Conditions so as to incorporate that provision into the contract in force between Flash and Baker Hughes. Baker Hughes argues that it made an offer to perform work to Flash, and that offer expressly and explicitly included Baker Hughes' Terms and Conditions, as contained in the fifteenth tab of an electronic transmission from one of Baker Hughes' employees, Don Credeur, to Flash's principal, Steve Haller. Baker Hughes continues that when Flash called it to perform the work proposed in the offer, by its action Flash accepted that offer without qualification, and thus a contract was fully perfected that included Baker Hughes' Terms and Conditions pursuant to La. Civ. Code Articles 1939 and 1942. As such, Baker Hughes claims that by the express provisions of the Terms and Conditions, Flash is precluded from stating a claim for loss of oil and gas revenues against Baker Hughes and that claim should be dismissed.

Baker Hughes alleges that the fifteenth tab, entitled "Terms and Conditions," sets forth Baker's standard Terms and Conditions governing its relationships with customers with whom it does not have a Master Service Agreement in place. Although Baker Hughes and Flash had previously discussed entering into a Master Service Agreement, it is undisputed that they had never done so. Baker Hughes claims that, from past dealings between Haller and Baker Hughes, Haller was well aware that, since Flash had no Master Service Agreement with Baker Hughes, Baker Hughes would only work for Flash

pursuant to Baker Hughes' Terms and Conditions. Moreover, Baker Hughes alleges that Haller had seen and agreed to Baker Hughes' Terms and Conditions at prior times relating to other work undertaken, and so Haller was not only familiar with the substance of the provision, but was well aware that they were in effect. Baker Hughes does not dispute that neither Haller nor anyone else from Flash ever signed any document expressly stating that it agreed to the Terms and Conditions, but asserts that the lack of signature on the Terms and Conditions and the fact that Haller or anyone else from Flash did not actually read the provisions are of no moment.

Baker Hughes also argues that the waiver of consequential damages such as the one at issue as contained in its standard Terms and Conditions is not unusual in the oilfield and that most of the other contractors who performed work for Flash on the Roche No. 2 well have standard terms and conditions which they work under, with essentially identical limitations concerning consequential damages.

Flash argues that a material question of fact exists as to whether Flash received the alleged e-mail and its attachment containing the Terms and Conditions provision. Flash denies that Baker Hughes sent or otherwise notified Flash of the Terms and Conditions when making its proposal to Flash or that the alleged e-mail was received by Flash, and posits that no Flash representative ever saw the Terms and Conditions and certainly never accepted the same. As such, Flash argues that under Louisiana law it cannot be bound to a contract or to provisions of a contract that it had not received nor had any knowledge of, and Baker Hughes cannot prove the e-mail was sent and/or received.

10

Flash asserts that Baker Hughes' theory that Flash knew the substance of the Terms and Conditions and knew that they were binding on the specific contract in force ignores the testimony of several witnesses regarding that issue. For one, in his deposition, Haller denied ever seeing the document marked Terms and Conditions. Also, Flash points to Credeur's deposition testimony that the only proof that he had that Flash received any part of his e-mail was seeing a set of schematics and some procedures that Baker Hughes created on Haller's desk, but he also admitted that he did not see the Terms and Conditions portion of the alleged e-mail at Flash's office. *(See Deposition of Baker Hughes, through Donald Credeur*, p. 116, attached as Exhibit "A" to defendant's Opposition). Flash also points to the deposition of Jimmy Joe Holland (Holland), who also testified as a corporate representative for Baker Hughes in its corporate deposition, wherein he admitted that he had no evidence that the alleged e-mail had either been sent or received. Holland testified that after Baker Hughes set the packer on the Roche No. 2 well allegedly at the incorrect depth, Holland undertook a search to see if the Terms and Conditions had been sent to Flash prior to Baker Hughes' alleged error on the Roche No. 2 well but found no evidence of such. (*See Deposition of Baker Hughes, through Jimmy Joe Holland*, pp. 26-27, attached as Exhibit "C" to defendant's Opposition).

Flash also denies that any previous work performed by Baker Hughes was governed by its Terms and Conditions or that Haller on behalf of Flash had previously agreed to the Terms and Conditions. Flash charges that Credeur had no documents or any evidence to prove his allegation that Flash had previously agreed to Baker Hughes' Terms

11

and Conditions nor could he identify when this alleged previous agreement occurred. Moreover, not only was Holland unable to determine whether the Terms and Conditions had been sent to Flash with respect to work on Roche No. 2 Well, but Flash points out that Holland's testimony is also significant because although Baker Hughes had done work for Flash in the past, Holland did not search for Terms and Conditions previously sent to or allegedly agreed to by Flash for other work.  Flash argues that, had Holland thought that previous instances where Flash accepted Baker Hughes' Terms and Conditions would bind Flash for work on Roche No. 2 well, he would not have limited his search to the current form of any alleged agreement.  Moreover, Flash points out that Holland gave no testimony that Flash had previously agreed to be bound by Baker Hughes' Terms and Conditions on any future work.

In short, the issue in the Motion before the Court may be framed as a matter of two possible contracts, one allegedly proposed in an e-mail with an attachment containing multiple provisions of the contract and the other apparently offered otherwise.  It is undisputed that a contract was formed;  Flash called Baker Hughes out to perform the proposed work and provide the discussed services, and it was Baker Hughes' undertaking of same which led to the case at bar.  However, the terms of the contract in force or exactly what contract is in force is certainly contested.  Regardless, one of the parties to the contract, Flash, denies ever receiving the written, electronic contract and the party seeking to enforce that contract and its particular Terms and Condition provision, Baker Hughes, cannot provide any evidence that the alleged contract was either sent, received or

accepted.

In Louisiana, the requirements to form a binding contract are set forth in the La. Civ. Code Art. 1927:

> A contract is formed by the consent of the parties established through offer and acceptance.
>
> Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent.
>
> Unless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made in the manner in which the acceptance is made

In reviewing the record, the Court finds that the circumstances do not clearly indicate that Flash intended to accept or otherwise consent to Baker Hughes' Terms and Conditions. Baker Hughes offers the testimony of Credeur that the email and its attachment, specifically the Terms and Conditions, were sent to Flash, and that it was acting on receipt of that offer that Flash called Baker Hughes to perform, thereby fully accepting the offer. Flash provides the testimony of its principal, Haller, that the email was never received and that he never saw the Terms and Conditions. As it were, there is a lack of proof that the e-mail and its attachment with the Terms and Conditions had actually been sent by Baker Hughes to Flash or received by and/or agreed to by Flash. Moreover, there is no evidence that anyone at Baker Hughes discussed the Terms and

Conditions, or specifically, the waiver of consequential damages clause, with Flash prior to conducting work on the Roche No. 2 well.  There is also a lack of evidence that Flash ever received or agreed to Baker Hughes' Terms and Condition in any way to be so as to be part of the contract in force relating to work performed and services rendered on Roche No. 2 well.

A motion for summary judgment can only be granted if the pleadings, depositions and affidavits submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Before a court can find that there are no genuine issues of material facts, it must be satisfied that no reasonable trier of fact could have found for the non-moving party.  *Ladue v. Chevron, U.S.A., Inc.*, 920 F.2d 272 (5th Cir. 1991). The parties each submit different versions of the facts relevant to whether Flash actually received the email and as to whether Flash received, saw and accepted the Terms and Condition attached to the email in Excel workbook format. There is no proof in the record that Baker actually sent the alleged e-mail containing the Terms and Conditions to Flash, and Flash, through its principal Steve Haller, denies ever seeing or accepting Baker Hughes' Terms and Conditions.  A case in such a posture is not properly disposed of by summary judgment.

## IV. CONCLUSION

Based on the record before the Court and the reasons stated herein, plaintiff's Motion for Partial Summary Judgment [Rec. Doc. 50] will be DENIED.